IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | * <br> * <br> * |
| Plaintiff, | * |
| v. | *    Civil Action No.: RDB-16-2640 |
| JACOB DACKMAN & SONS, LLC, et al., | * <br> * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This case arises out of a lead paint lawsuit filed by defendant Daniel Heggie ("Heggie") in the Circuit Court of Maryland for Baltimore City against his former landlords, defendants Jacob Dackman & Sons, LLC and Elliot Dackman ("the Dackman parties"). *Daniel Mathew Heggie, Jr. v. Jacob Dackman & Sons, LLC, et al.*, Case No. 24-C-13-006788 (Cir. Ct. Balt. City) ("the Underlying Litigation"). Following a jury trial in that case, judgment was entered against the Dackman parties in the amount of $1,006,469.00 ("the Underlying Judgment").

In this Court, plaintiff Pennsylvania National Mutual Casualty Insurance Company ("plaintiff" or "Penn National") seeks a declaratory judgment regarding the extent of its obligation to indemnify the Dackman parties pursuant to a commercial general liability policy it issued to them on June 1, 1991, and which subsequently was renewed through August 1, 1997. (ECF No. 1.) Specifically, Penn National asserts that it is only liable for

1

$165,606.72 of the Underlying Judgment against the Dackman parties based on the "pro rata time-on-the-risk" principle set forth in *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106 (4th Cir. 2012), a case arising out of this Court. *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Attsgood Realty*, JFM-09-2650, 2010 WL 2998681. It is undisputed that Penn National already has paid this amount to Heggie. (ECF No. 10 at ¶ 4.) While defendant Heggie does not dispute that *Roberts* governs the outcome of this case, he asserts that the pro rata time-on-the-risk calculation should be based on "the limited period of time that [Heggie] was being ***injured*** by lead-based paint—and not, as Penn National alleges, the entire time he was simply being ***exposed*** to [] lead-based paint." (ECF No. 29-1 at 3) (emphasis in original.) Thus, Heggie argues that Penn National must indemnify the Dackman parties for a total of $620,991.37, and therefore should pay him an additional $455,384.65 toward the total judgment entered in the Underlying Litigation.[1]

Now pending before this Court is Penn National's Motion for Summary Judgment ("Plaintiffs' Motion"). (ECF No. 26.) During a teleconference on September 13, 2017, the parties confirmed that no additional factual discovery is required; that this Court should render its decision based on the record developed in the Underlying Litigation; and that in rendering its decision on plaintiff's pending Motion for Summary Judgment, this Court should rule as a matter of law on the overall merits of this declaratory judgment action. (ECF No. 33.) No additional hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons stated below, Penn National's Motion for Summary Judgment is DENIED to

---

[1] Based on their failure to plead or otherwise defend in this litigation, defaults were entered against defendants Jacob Dackman & Sons, LLC and Elliott Dackman on December 8, 2016. (ECF No. 15.) Pursuant to the judgment of the Circuit Court of Maryland for Baltimore City, the Dackman parties remain liable for any amount not paid by Penn National.

2

the extent it seeks to limit its liability to $165,606.72. It is further ADJUDGED that Penn National is liable under the insurance contract for 25% of Heggie's damages (amounting to $251,617.25) based on the "pro rata time-on-the-risk" principle set forth in *Roberts*. Accordingly, Penn National is liable to Heggie for an additional $86,010.53 toward the Underlying Judgment.

### BACKGROUND

Penn National issued an insurance contract to the Dackman Parties, contract number 307-0351437, for the contract period June 1, 1991 to June 1, 1992, which was renewed annually and in effect through August 1, 1997.[2] (ECF No. 1 at ¶ 8.) The insurance contract provided benefits in connection with certain real estate identified in the insurance contract, including, among other properties, 2315 East Hoffman Street in Baltimore, Maryland (the "Premises"). (*Id.* at ¶ 10.) The Insurance Contract included a commercial general liability coverage part. (*Id.* at ¶ 11.)

Defendant Daniel Heggie ("Heggie") was born on October 2, 1993 and began living at 2315 East Hoffman Street on January 12, 1994, when he was approximately three and one-half months of age. (ECF No. 26-1 at ¶¶ 1-2; ECF No. 29-1 at ¶¶1-2.) Heggie's tenancy there ended permanently when he vacated the Premises on September 9, 1998. (*Id.* at ¶ 2; *id.* at ¶ 2.) It is undisputed that the Premises contained chipping, peeling, and flaking lead-based paint during Heggie's tenancy there. (ECF No. 26-1 at ¶ 5.)

---

[2] While the insurance policy was in effect from June 1, 1991 through August 1, 1997, it is undisputed that coverage benefits for periods other than June 1, 1996 through August 1, 1997 were exhausted and unavailable to satisfy the Underlying Judgment. (ECF No. 26-1 at ¶¶ 37-43.)

On November 12, 2013, Heggie filed a lawsuit in the Circuit Court of Maryland for Baltimore City styled *Daniel Mathew Heggie, Jr. v. Jacob Dackman & Sons, LLC, et al.*, Case Number 24-C-13-006788, alleging, *inter alia*, that the Dackman Parties had caused him to sustain certain personal injuries as a result of exposure to lead in paint on the Premises. (ECF No. 1 at ¶ 13.) The evidence presented at trial in the Underlying Litigation was that Heggie first exhibited an elevated blood lead level ("BLL") on August 18, 1995. (ECF No. 26-1. at ¶ 7; ECF No. 29-1 at ¶ 3.) Subsequent tests revealed that Heggie also had elevated BLLs on August 18, 1995, July 8, 1997, April 13, 1999, and February 13, 2001. (*Id.* at ¶¶ 7-8, 28; *id.* at ¶¶ 3-5.) Heggie's medical causation expert, Dr. Daniel Levy, M.D., opined that Heggie's elevated BLLs were caused by his exposure to lead paint in the premises. (ECF No. 26-1 at ¶ 26.) Dr. Levy was unable to opine whether Heggie was exposed to lead paint after he vacated the Premises. (*Id.* at ¶ 30.) However, Dr. Levy testified that: "What the general trend was when [Heggie] moved out of [the Premises]…is that the lead levels gradually came down, that the implication of that to me is that there was not a continuing source of exposure." (ECF No. 29-1 at ¶ 7) (citing ECF No. 26-8 at 112, Apr. 20, 2016 Trial Tr. at 112:7-10.) At the conclusion of the jury trial in the Underlying Litigation, judgment was entered against the Dackman parties in the amount of $1,006,469.00. (ECF No. 26-1 at ¶ 51.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A

material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In lead paint or "continuous trigger" cases such as this, "Maryland courts determine an insurer's liability through a "pro-rata allocation by 'time on the risk.'" *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 111 (4th Cir. 2012). Under this principle, "[e]ach insurer is liable for that period of time it was on the risk compared to the *entire* period during which damages occurred." *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. 256, 313, 802 A.2d 1070, 1104 (2002) (quoting *Domtar, Inc. v. Niagara Fire Insurance Co.*, 563 N.W.2d 724, 733 (Minn. 1997)).

## ANALYSIS

It is undisputed that Penn National is contractually obligated to indemnify the Dackman parties pursuant to an insurance policy in effect from June 1, 1996 to August 1, 1997—that is, 426 days. (ECF No. 26-1 at ¶¶ 37-38.) It is also undisputed that the calculation of Penn National's liability is governed by the "pro rata time-on-the-risk" principle set forth in *Roberts*, 668 F.3d 106. (ECF No. 26-1 at ¶ 45; ECF No. 29-1 at 2-3.) Under *Roberts*, the "insurer is liable for that period of time it was on the risk compared to the *entire* period during which damages occurred." *Roberts*, 668 F.3d 106, 113 (emphasis in original) (quoting *Utica*, 145 Md. App. 256, 802 A.2d 1070, 1103).

5

Penn National asserts that the "entire period during which damages occurred" is the 2,589 day period from January 12, 1994—when Heggie moved into the Premises—to February 13, 2001—the date of Heggie's final elevated BLL. (ECF No. 26-1 at 22-25.) Thus, Penn National asserts that its "pro rata time-on-the-risk" liability equals 16.45% of the Underlying Judgment—a total of $165,606.72.[3]

While Heggie does not dispute the 426 insured day numerator, he asserts that Penn National overstates the appropriate denominator—the "entire period during which damages occurred." (ECF No. 29-1 at 3-4.) Specifically, Heggie asserts that the correct figure is the 690 day period from August 18, 1995—the date of Heggie's first elevated BLL—to July 8, 1997—the date of Heggie's last elevated BLL test before he vacated the Premises. (*Id.*) Thus, Heggie asserts that Penn National's "pro rata time-on-the-risk" liability equals 61.7% of the Underlying Judgment—a total of $620,991.37.[4] (*Id.* at 8-9.)

The disputed question of law, therefore, is the proper determination of the "entire period during which [Heggie's] damages occurred" under *Roberts*. Although the Fourth Circuit in *Roberts* affirmed the district court's use of the plaintiff's final elevated BLL as the "cut-off point for [Roberts'] period of exposure," *Roberts* does not mandate the use of this indicator, and the basis for the district court's use of this date is somewhat unclear. *See Pennsylvania Nat. Mut. Cas. Ins. Co. v. Attsgood Realty*, JFM-09-2650, 2010 WL 2998681, at *1, n. 2 (D. Md. July 27, 2010) ("Roberts continued to reside at the subject premises until

---

[3] Penn National's calculation is as follows:
    426 insured days / 2,589 days of damages = 16.45 %.
    16.45% x $1,006,469.00 Underlying Judgment = $165,606.72 pro rata time-on-the-risk liability.

[4] Heggie's calculation is as follows:
    426 insured days / 690 days of damages = 61.7 %.
    61.7% x $1,006,469.00 Underlying Judgment = $620,991.37 pro rata time-on-the-risk liability.

6

sometime in 1998 but I find that the August 1995 test should be the cut-off date for application of the continuous trigger rule because by that time the harm had been done."). Accordingly, this Court is not bound to use Heggie's February 2001 BLL as the end date of the "entire period during which damages occurred," but must base this determination on the evidence presented at trial in the Underlying Litigation. *See* ECF No. 33.

Dr. Daniel Levy testified in the Underlying Litigation that Heggie was exposed to lead-based paint while living at the Hoffman Street Premises, that his exposure there was a substantial contributing factor to his elevated BLLs, and that Heggie's exposure to lead-based paint there caused his injury. (ECF No. 26-1 at ¶¶ 16-18) (citing ECF No. 26-8 at 112, Apr. 20, 2016 Trial Tr. at 84-90.) While Heggie's earliest elevated BLL was measured on August 18, 1995, his exposure preceded his manifestation of an elevated BLL. *See* ECF No. 26-8 at 122-123 ("[G]enerally if I see a lead level, I presume that the child is exposed prior to the date where the child was tested."). Heggie moved into the lead-polluted premises on January 12, 1994. (ECF No. 26-1 at ¶ 2.) There is no evidence of any lead abatement between Heggie's move-in and his August 18, 1995 elevated BLL. Thus, the evidence indicates that the 'trigger' for coverage of Heggie's damages was the date when he was first *exposed* to the lead-polluted property—January 12, 1994—and not when he was first *tested* for lead poisoning, in August 1995.

Turning then to the end date of Heggie's damages, it is undisputed that Heggie continued to manifest elevated BLLs after he vacated the Hoffman Street Premises on September 9, 1998. (ECF No. 26-1 at ¶ 28.) Based on the continuing presence of lead in his blood, Penn National asserts that Heggie continued to be injured until February 2001, the

7

date of his final elevated BLL.[5] (*Id.* at ¶¶ 19, 28.) While the parties agree that the continued presence of lead in Heggie's blood was harmful, Penn National is unable to point to any known external source of lead poisoning which would trigger insurance coverage of Heggie's damages following his move-out from the Hoffman Street Premises. Indeed, the undisputed record before this Court reflects that Dr. Levy was unable to opine whether Heggie's elevated BLLs in April 1999 and February 2001 were attributable to continued exposure to lead from an external source, or from the internal redistribution of the lead to which Heggie already was exposed at the Premises. (*Id.* at ¶ 30.) Specifically, Dr. Levy testified that "[w]hat the general trend was when [Heggie] moved out of [the Premises]…is that the lead levels gradually came down, that the implication of that to me is that *there was not a continuing source of exposure.*" (ECF No. 29-1 at ¶ 7) (citing ECF No. 26-8 at 112, Apr. 20, 2016 Trial Tr. at 112:7-10) (emphasis added.) As there is no evidence of an independent source triggering coverage of Heggie's injuries, then the appropriate end date for Heggie's "entire period of damages," as defined by the Fourth Circuit in *Roberts*, is the latest date of lead exposure triggering coverage—here, September 9, 1998 when he permanently vacated the Hoffman Street Premises.[6]

Based on the foregoing, the "entire period during which [Heggie's] damages occurred" under *Roberts* was the **1,701 day** period from **January 12, 1994**, when he moved into the Hoffman Street Premises, until **September 9, 1998**, when he permanently vacated

---

[5] This Court notes the perverse implication of Penn National's position: under its theory, the longer the duration of the injury, the less compensation the victim would receive—even as the period of applicable insurance coverage remained the same.

[6] While Penn National seeks to marshal as evidence certain *allegations* of subsequent exposure made by Heggie in the Underlying Litigation and in related coverage actions, it is unable to point to any other *evidence* of Heggie's exposure to lead paint after he vacated the Hoffman Street property. *See* ECF No. 30 at 7-8.

8

the Premises. (ECF No. 26-1 at ¶¶ 1-2; ECF No. 29-1 at ¶¶1-2.) Accordingly, applying the agreed 426 insured day numerator, Penn National is contractually obligated to indemnify the Dackman parties for **25%** of Heggie's damages, or **$251,617.25**.[7] As Penn National has already paid to Heggie $165,606.72, it remains liable to him for an additional $86,010.53.

## CONCLUSION

For the reasons stated above, Penn National's Motion for Summary Judgment (ECF No. 26) is DENIED to the extent it seeks to limit its liability to $165,606.72. It is further ADJUDGED that Penn National is liable under the insurance contract for 25% of Heggie's damages (amounting to $251,617.25) based on the "pro rata time-on-the-risk" principle set forth in *Roberts*, and is therefore liable to Heggie for an additional $86,010.53.

A separate Order follows.


Dated: September 14, 2017 _____/s/_____
Richard D. Bennett
United States District Judge

---

[7] This Court's calculation is as follows:
426 insured days / 1,701 days of damages = 25.0 %
25.0% x $1,006,469.00 Underlying Judgment = $251,617.25 pro rata time-on-the-risk liability.